**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 8812 Tavern Corp. d/b/a Bench Sports Bar, Christina Malerba, and Nicholas Racklin, for themselves and for all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> National Football League, Inc. 345 Park Avenue, 7th Floor New York, NY 10154 <br><br> NFL Enterprises LLC 345 Park Avenue, 7th Floor New York, NY 10154 <br><br> DirecTV, LLC 2230 East Imperial Highway El Segundo, California 90245-3504 <br><br> and <br><br> DirecTV Holdings LLC 2230 East Imperial Highway El Segundo, California 90245-3504, <br><br> Defendants. | Civil Action No. 15-cv-6771 <br><br><br> **COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO SECTIONS 1 AND 2 OF THE SHERMAN ACT** |

## CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, by and through its attorneys, complain and allege as follows:

### INTRODUCTION

1.      The NFL, which has monopoly power in professional football, is the most profitable sports league in the country.  A substantial portion of this income is derived from selling the league's broadcast rights, which amount to over $6 billion in revenue each year.

2.     Through DirecTV's "NFL Sunday Ticket" service, negotiated exclusively with the NFL for more than 20 years, DirecTV is the sole and exclusive distributor of live "out of market"[1] NFL games.   This exclusive deal allows the NFL and DirecTV to charge supracompetitive prices for the NFL Sunday Ticket, causing staggering anticompetitive losses to purchasers.   As DirecTV says on its own website: "Only DIRECTV brings you every play of every out-of-market game, every Sunday.   Get the action on your TV with NFL SUNDAY TICKET."   This exclusive arrangement is not only highly lucrative for DirecTV, but also for the NFL—the Sunday Ticket package alone is scheduled to bring the league $1.5 billion in revenue each year from 2015 through 2022.

3.     Each NFL team has a property right in licensing the live broadcasting of its own games.   Absent restraints, individual teams would compete not only on the playing field and for player talent, but for television viewers as well.   For example, the Detroit Lions would be able to market their own games to stations across the country who would be interested in featuring performances by superstar Calvin Johnson; currently, for many Sunday afternoon games, Calvin Johnson is predominately seen nationally only as part of the exclusive package of games sold by the NFL to DirecTV through the NFL Sunday Ticket package.   The NFL teams have combined to eliminate competition by denying the ability of each individual team to sell rights to networks, syndicates, or individual television stations or cable operators.   The agreement among the NFL

---

[1] Out of market games means NFL games played on Sunday afternoon and not otherwise broadcast on CBS, Fox, or formerly on NBC within the viewer's television market.   The definition also excludes games within the home territory of one of the NFL teams that is not aired on CBS, Fox, or formerly on NBC, due to the team's failure to sell all of the tickets to the game prior to the blackout deadline for that game.   This distinct product, called the NFL Sunday Ticket or Sunday Ticket, has been trademarked by Defendants and is recognized by them as a separate product from NFL games broadcast on Fox, CBS, NBC, ESPN, and NFL Network.

teams to pool their broadcast rights and sell those exclusive rights to the highest bidder is precisely the kind of restraint on trade that the Sherman Act prohibits.[2]

4.      The importance of out-of-market television broadcasting to the NFL and DirecTV cannot be overstated.  Displaced fans—those loyal to a team outside of their local market— represent a significant portion of the NFL's viewership.  The NFL's former general manager of mobile, Manish Jha, recently estimated there to be 50 million displaced fans in the United States.  And Fanatics, an online merchandiser of licensed NFL apparel, estimates that a whopping 74% of NFL fans root for teams outside of their local area.  Their significance to Sunday Ticket has been acknowledged by DirecTV.  As one DirecTV senior executive stated, the passion and loyalty displayed by these fans "has driven the enormous popularity of our exclusive NFL Sunday Ticket package."

5.      Displaced fans, however, are not the only notable audience for a league-wide offering such as Sunday Ticket.  These exclusive packages also reduce the competition among teams for fans of the sport as a whole.  Absent the restraints, teams would also compete for out-of-market viewers who are fans of the sport more generally.

6.      The actions of the NFL and DirecTV have several anticompetitive effects.  The exclusivity of the deal limits the choice consumers have in choosing a carrier to watch out-of-market NFL games.  By preventing competition from other carriers, this exclusivity permits DirecTV to charge its subscribers supra-competitive prices.  This lack of competition also limits innovation in the quality and services that subscribers might otherwise benefit from in a competitive environment.  For example, competition could cause carriers to innovate in notifying

---

[2] In some limited respects, such a restraint on trade is permitted under the Sports Broadcasting Act of 1961.  As discussed *infra* at ¶¶ 78-80, though, the Sports Broadcasting Act does not apply to the alleged anti-competitive conduct at issue in this case.

viewers of key game events, providing game statistics, or integrating with social media and fantasy football programs. Further, the anticompetitive contract with DirecTV reduces the overall number of viewers of NFL games, given that displaced fans are currently not able to watch their favorite teams without paying exorbitant prices. Absent the restraints, the NFL teams would compete to generate television contracts that would make games more widely available to fans.

7.      This is a class action brought on behalf of a nationwide Class of purchasers of DirecTV and the NFL Sunday Ticket—described herein as "purchasers"—that challenges an agreement by Defendants the National Football League, Inc. and NFL Enterprises LLC (collectively, the "NFL"), DirecTV, LLC and DirecTV Holdings LLC (collectively, "DirecTV") to protect and increase the monopoly profits earned by DirecTV and the NFL from the live broadcast of Sunday afternoon "out of market" NFL games. All allegations herein are based on information and belief except for those relating to Plaintiffs and their own actions.

8.      Plaintiffs seek to enjoin under the federal antitrust laws the ongoing, unreasonable restraint of trade that Defendants have implemented through DirecTV's exclusive deal to broadcast all Sunday afternoon out of market games. They also seek to recover damages for the Class the supracompetitive premiums that DirecTV has charged for NFL Sunday Ticket as a result of this unreasonable restraint of trade.

9.      This exclusive agreement eliminates competition by preventing other multichannel video programming distributors ("MVPDs") from distributing Sunday afternoon out-of-market NFL games. But for the exclusive agreement between DirecTV and the NFL, additional MVPDs would be willing to compete for consumers of these games—and indeed, three MVPDs, Comcast, Time Warner and Cox, attempted in 2002 to obtain rights to broadcast

Sunday Ticket on a non-exclusive basis—which would reduce subscriber costs, enhance viewership and enhance competition among teams for that viewership—but were told by the NFL that the bid would not be accepted.  In addition, but for the horizontal agreement among NFL teams to sell a single package of out-of-market games, those individual NFL teams would compete against each other and drive down the broadcast prices of out-of-market games.

### JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), for a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.  This Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.   The Defendants transact business in this District, and are subject to personal jurisdiction here.

12.     Class members were injured in this District and the NFL is headquartered in this District.

### PARTIES

**Plaintiffs**

13.      Plaintiff 8812 Tavern Corp. d/b/a Bench Sports Bar is a pub located in Brooklyn, NY.  Bench Sports Bar has purchased the Sunday Ticket from DirecTV in order to attract patrons to its establishment on Sunday afternoons during the NFL's professional football season.

14.     Plaintiff Christina Malerba resides in Staten Island, NY.  She has purchased the Sunday Ticket package from DirecTV.

15.     Plaintiff Nicholas Racklin resides in Huntington Beach, CA.  He has purchased the Sunday Ticket package from DirecTV.

**Defendants**

16.    Defendant DirecTV Holdings LLC is a Delaware Limited Liability Company and has a headquarters at 2230 East Imperial Highway, El Segundo, California, and corporate offices in New York, NY.  It is the U.S. operating arm of DirecTV, Inc. and describes itself as "a leading provider of digital television entertainment in the United States."  It claims that "[a]s of December 31, 2014, [it] had approximately 20.4 million subscribers."

17.    DirecTV, LLC is a California Limited Liability Company that has a headquarters at 2230 East Imperial Highway, El Segundo, California, and corporate offices in New York, NY. DirecTV, LLC issues bills to its commercial subscribers.

18.    Until 2015, the NFL was an unincorporated association of 32 American professional football teams in the United States.  Each of the 32 NFL member teams, headquartered in various cities across the country, is separately owned and operated, acting in its own economic self-interest and competing in most respects with one another.  Those teams are as follows:

| NFL Defendant Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |

| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
|---|---|---|
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football Inc. | Maryland | Washington Redskins |

19.     In or about 2015, the NFL incorporated as the National Football League, Inc., and has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.  On information and

belief, NFL Enterprises LLC was organized to hold the broadcast rights of the 32 NFL teams and license them to MVPDs and other broadcasters, including DirecTV.  NFL Enterprises LLC is also located at 345 Park Avenue, 7th Floor, New York, NY 10154.

20.     Each NFL team has a property right in licensing the television broadcasting rights of its own games.  And yet, the teams have agreed to allow the NFL to negotiate on their behalf television contracts with national broadcasters, including for the broadcast of each team's games outside its home territory, and not to compete with each other over the licensing of those rights. These include the Sunday Ticket package sold only through DirecTV.

## TRADE AND COMMERCE

21.     The NFL is by far the most significant provider of professional football in the United States.  According to a Harris Poll, the NFL has been ranked the most popular American sport for 30 consecutive years.  According to The Nielsen Company, the 2014 regular season reached 202.3 million unique viewers, representing 80 percent of all television homes and 68% percent of potential viewers in the U.S.  According to the Nielsen Company, NFL games accounted for every one of the top 20, and 45 of the 50, most-watched TV shows among all programming in the fall of 2014.

22.     The NFL brings in about $6 billion annually in total television revenue from all sources.  In 2011, the NFL signed nine-year extensions of its existing broadcast deals with Fox Broadcasting, CBS and NBC that will run through the 2022 season.  According to news articles, ESPN, Fox Broadcasting, CBS and NBC pay respectively $1.9 billion, $1.1 billion, $1 billion and $950 million per year for the right to broadcast NFL games.  The Wall Street Journal reported in September of 2014 that CBS paid $300 million for the right to telecast NFL "Thursday Night Football" for one year.

23.     In October of 2014, it was announced that DirecTV and the NFL entered into a new telecasting deal worth $1.5 billion annually for the next eight years, a deal that will bring $8 billion more to the NFL (over four additional years) than its last deal with DirecTV.  Through these and other contractual deals, the NFL, its member teams and DirecTV engage in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

**A.     Relevant Market and Barriers to Entry**

24.     The relevant geographic market is the United States.  The relevant product market is live broadcasts of NFL Sunday afternoon out-of-market games.  Broadcasts of other sports or other content do not compete with broadcasts of NFL games.  Moreover, NFL games broadcast locally on CBS and Fox Broadcasting on Sunday afternoons are not interchangeable with the multi-game offering provided by Sunday Ticket specifically because the local games are different from the multi-game offering provided by Sunday Ticket, which caters to fans that are not located within the geographical confines of their favorite teams' home territories or have a broader interest in watching football games other than those broadcast in their local area.

25.     Although there is undoubtedly some substitution that might occur between in-market broadcasts (broadcasts of games that include the local NFL team) and out-of-market broadcasts, the availability of the in-market games does not compete away a monopolist's ability to raise the price of out-of-market games above competitive levels.

26.     New entries that would dilute the market power over NFL video broadcasts created by the collusive agreements at issue here are extremely unlikely.

27.     New entries would require the creation of a new professional league playing American football.  Such an undertaking would be enormously expensive, and—based on

history—very unlikely to succeed.  Even if a new entrant did appear, and even if it were sufficiently successful to sustain itself, it is unlikely that the resulting video product would compete sufficiently with the NFL's broadcasts to dissipate the NFL's monopoly power.

28.     In the 95 years since the NFL's formation in 1920, there have only been a few noteworthy attempts at entry into the market for American football games.  Three times, once each in the decades of the 1920s, 1930s, and 1940s, an entity calling itself the American Football League (AFL) was formed, briefly operated and then failed.  In 1960 another entry attempt, also under the name AFL, operated independently for nine years before merging with the NFL in 1970.

29.     The United States Football League ("USFL") was founded in 1982 and was disbanded in 1986.  It sued the NFL for monopolization and won a jury verdict. *USFL v. NFL*, 842 F.2d 1335 (2d Cir. 1988).  There have also been failed attempts to start and sustain a women's football league and various minor leagues or talent development leagues.  The closest thing to a successful entry is the Arena Football League, which plays a substantially different type of football—indoor football.  The Arena Football League ("AFL") began play in 1987 and continued through the 2008 season.  The league was reorganized in 2010 and continues today.  However, the games of the AFL are played in spring and summer to avoid competition with NFL football broadcasts.  In addition, AFL produces an altogether different sport that does not compete substantially with the NFL for broadcast audience.

30.     NFL teams are well established and popular, with 32 regionally diverse teams in or near almost every major population center in the United States.  There are NFL teams within 18 of the 25 most populous metropolitan areas, dramatically limiting the locations and audiences available to new teams or leagues.  During the NFL's long history not one of the few sporadic

attempted entries has been successful at competing for NFL football broadcast audiences.  It is virtually impossible that a new league will form to compete away the NFL's monopoly power.

31.     That monopoly power will only be tempered if the underlying collusive agreement that created the monopoly power is broken up through antitrust authority, or if the exclusive deal that propagates that monopoly power is replaced by non-exclusive licenses.

32.     The value of the monopoly power that DirecTV exercises as a result of its exclusive deal with the NFL is illustrated by the recent acquisition offer for DirecTV from AT&T.  As Forbes noted in an October 1, 2014 article:

> DirecTV has renewed its agreement with the National Football League for another 8 years.  However, this time around, the price is increased by 50% to around $1.5 billion a year.  This is very expensive and far more than $1 billion that CBS, NBC and Fox pay for their respective NFL coverage.  The satellite company offers to its subscribers the popular NFL Sunday Ticket, a sports package that broadcasts NFL regular season games that are not available on local affiliates.  Aided by the NFL, DirecTV has managed to attract customers even at times when other pay-TV operators were losing subscribers.  The extended deal with the NFL will aid to the overall subscriber growth for the company.  Moreover, the agreement was of key importance for DirecTV, as its proposed merger with AT&T to some extent was dependent on this deal.

33.     Indeed, AT&T's $48.5 billion offer to purchase DirecTV contains a clause allowing AT&T to cancel the deal if DirecTV loses its exclusive, collusive contract for Sunday Ticket.  That clause provides: "[t]he parties also have agreed that in the event that DirecTV's agreement for the 'NFL Sunday Ticket' service is not renewed substantially on the terms discussed between the parties, the Company [AT&T] may elect not to consummate the Merger."

## B.     The NFL and the Broadcast Rights Agreements

34.      The NFL Sunday Ticket is an out-of-market sports package that carries all games produced by the networks that broadcast the Sunday afternoon games (currently Fox and CBS).  A purchaser of Sunday Ticket can choose to watch any of the out of market Sunday afternoon

NFL games, instead of being restricted to the games being telecast by the local Fox Broadcasting or CBS affiliates.  Sunday Ticket appeals to NFL fans with loyalties to out-of-market teams, to fans of the game more generally, and to the bars and restaurants catering to them.  These businesses generate a substantial share of their overall revenue by having the capability to televise multiple professional football games simultaneously in order to attract a diverse range of fans to their establishments on Sunday afternoons during the fall football season.

35.     The NFL's 32 member teams have pooled their television rights and given the league authority to negotiate pooled rights television deals on their behalf.  Rather than competing over their share of the total revenue from NFL broadcasting rights, the NFL teams have agreed to exchange an equal share of the resulting revenues.  Currently, the league has the following deals: CBS and Fox Broadcasting have the right to broadcast Sunday afternoon games subject to the league's restrictions on out of market games; NBC has the exclusive right to nationally broadcast prime-time Sunday night games (NBC Sunday Night Football); ESPN has the exclusive right to nationally broadcast prime-time Monday night games (Monday Night Football); the NFL Network—a cable and satellite network owned by the NFL—nationally broadcasts nine regular season games, in partnership with CBS; and DirecTV's Sunday Ticket package has the exclusive right to distribute out of market games.  The following chart summarizes the NFL television contracts (dollar amounts shown in millions):

| Period | AFC Package | NFC Package[3] | Sunday Night | Monday Night | Thursday Night | DirecTV Sunday Ticket | Total Amount |
|---|---|---|---|---|---|---|---|
| 2006–2013 | CBS ($622.5) | Fox ($712.5) | NBC ($650) | ESPN ($1,100) | NFL Network (2nd half) ($0) | DirecTV (**$1,000**) | $3,085 |
| 2014–2021 | CBS ($1,000) | Fox ($1,100) | NBC ($950) | ESPN ($1,900) | NFL Network ($0) NBC (Wks 1, 12) CBS (Wks 2–8, $275, 2014–15 only) | DirecTV (2015-2022) (**$1,500**) | >$6,500 |

36.     Pursuant to the agreements, the networks that own the Sunday afternoon in-market broadcasting rights (currently CBS and FOX) must generally broadcast any Sunday afternoon game being played by a team whose territory falls within the local affiliate's coverage area (i.e., an "in market game").  The practical result for fans is that during most weeks of the season, only three Sunday afternoon games are available to viewers who do not buy the Sunday Ticket, and the specific games available to any given viewer depend on whether the viewer is located within a team's home territory and whether that team is playing on Sunday afternoon.

37.     As a result of this anticompetitive arrangement, a viewer who for any reason wants to watch more or different games on television than the three shown on the local affiliates

---

[3] The AFC and NFC packages consist of Sunday afternoon games during each week of the regular season, a single game for each network on Thanksgiving, wild card games, divisional playoff games and the respective conference championship game for each network.

must purchase DirecTV's Sunday Ticket, or visit a commercial establishment that does. This includes displaced fans, whose favorite team is outside their home territory, and fans of fantasy football who do not want to be stuck watching the only three games that are available on television.

### C. DirecTV and NFL Sunday Ticket

38. Beginning in 1994, pursuant to an exclusive agreement with the NFL, DirecTV began to offer its subscribers access to the Sunday afternoon games that are not otherwise available in their market via national broadcasts. These subscribers could purchase NFL Sunday Ticket, a premium subscription-based package that provides access to all Sunday afternoon games broadcast on Fox and CBS, or their predecessors.

39. Through its exclusive agreement with the NFL, DirecTV today takes the live game telecast feeds produced by CBS and Fox and redistributes them without alteration to NFL Sunday Ticket subscribers via DirecTV channels. NFL Sunday Ticket subscribers can thus access all Fox or CBS games, except for the "in market" games broadcast by the local Fox or CBS affiliate, which are available on the local Fox or CBS channel.

40. Defendants have colluded to sell the out-of-market NFL Sunday afternoon games only through DirecTV. Such an arrangement eliminates competition in the distribution of out-of-market Sunday afternoon games and requires anyone wishing to view these games to subscribe to DirecTV and purchase NFL Sunday Ticket at the supracompetitive price dictated by DirecTV.

41. DirecTV's exclusive arrangement with the NFL results in NFL Sunday Ticket subscribers and purchasers, including the Plaintiffs, to pay a higher price for NFL Sunday Ticket (and other access charges) than they otherwise would pay if the agreements were negotiated competitively.

42.     In October of 2014, DirecTV renewed its exclusive agreement with the NFL.  The renewal requires DirecTV to pay the NFL an average of $1,500,000,000 ($1.5 billion) per year for eight years in return for the exclusive right to rebroadcast NFL Sunday afternoon games on Defendants' NFL Sunday Ticket service.

43.     As NFL Commissioner Roger Goodell said in announcing the deal, "[w]e are pleased to continue our partnership with DirecTV….DirecTV and Sunday Ticket have served our fans well for 20 years and continue to complement our broadcast television packages." DirecTV Chairman, President and CEO Mike White stated that "[t]his new agreement is a testament to the terrific long-term relationship we have with the NFL….NFL Sunday Ticket has always been the centerpiece of DirecTV's sports leadership and we're pleased to continue our relationship with the NFL and be a part of the league's future growth and success."

**D.     Supracompetitive Prices**

44.     The anticompetitive conduct that has led to the exclusive deal with DirecTV has generated a series of supracompetitive price increases.  For example, this year—the first after obtaining a new eight-year exclusive contract with the NFL in 2014—DirecTV raised its prices on the Sunday Ticket package for home subscribers from 5 to 7.3%.  The NFL has also generated increasingly high revenue from DirecTV for the package.

45.     The NFL is unique in its licensing of league games.  Teams in several sports leagues assign to their league the broadcast rights for at least some games, which the league then sells to a national network.  While the pooled rights that are sold by other leagues cover only a small fraction of all league games, the NFL pools and sells televisions rights to all league games. Although the rights to televise all NFL games are sold to national broadcast networks, the actual

telecasts of most games are regionalized in that they are televised only or primarily in the television markets of the teams in the contest plus nearby local television markets.

46. DirecTV's arrangement with the NFL allows the Defendants to restrict the output of, and raise the prices for, the live broadcast of NFL Sunday afternoon out of market games. Every NFL member team owns the initial rights to the broadcast of that team's games. However, the teams have chosen to collude with each other, and to grant the NFL the exclusive right to market those games outside each team's home market. But for the NFL teams' agreement in which DirecTV has joined, teams would compete against each other in the market for NFL football programming, which would likely induce more competitive pricing.

47. DirecTV's ability to offer Sunday Ticket on an exclusive basis is material to its operations. Indeed, DirecTV's recent merger with AT&T depended, in substantial part, on continued exclusivity of this service. As DirecTV noted in a filing with the Securities and Exchange Commission on December 3, 2014, "Pursuant to the Merger Agreement, AT&T had the right to terminate the Merger Agreement or not consummate the Merger if we failed to enter into a contract with the NFL providing for exclusive distribution rights for the NFL Sunday Ticket service." The fact that NFL Sunday Ticket is only available through DirecTV locks subscribers into the DirecTV service throughout the year. Other MVPD competitors, such as Dish Network and Comcast, are at a competitive disadvantage, and, as a result, DirecTV can extract monopoly rents for its service. See, e.g., Comments of Cox, FCC MB Docket Nos. 12-68, 07-18, 05-192, at 3 (June 22, 2012) ("the exclusivity deal causing the most significant market distortion today is DirecTV's Sunday Ticket package"); Testimony of Roger Noll before the Committee on the Judiciary, United States Senate (Nov. 14, 2006) ("From my perspective, if one adopts the right counterfactual, the right but-for world in the competitive environment, it is

obvious that NFL Sunday Ticket is a palliative compared to the output and prices that would exist in a competitive environment.").

48.     In the United States, Dish Network, a competing satellite MVPD, concedes that "DirecTV's flagship exclusive promotion is that they are the only TV provider to offer the NFL Sunday Ticket . . . . If you want the NFL Sunday Ticket, then DirecTV wins this battle every time."  However, Dish Network promotes itself as having "more channels with a lower monthly bill" and that "Dish wins versus DirecTV in the price category."  Dish Network and other MVPDs would compete with DirecTV on price and service if they had access to distribution of the Sunday Ticket.

49.     The NFL is the most popular professional sports league in the United States. Because DirecTV and the NFL know that Plaintiffs and the Class must purchase the Sunday Ticket to view and exhibit live out of market broadcasts, DirecTV and the NFL have agreed to set prices for NFL Sunday Ticket that are far higher than a competitive market would allow.  But for DirecTV's agreement to protect the NFL through its exclusive Sunday Ticket contract, prices for the live broadcast of out of market Sunday afternoon NFL games would be much lower, as would the cost of DirecTV programming packages required to be purchased in conjunction with Sunday Ticket.

50.     Of the four major professional sports in this country—baseball, basketball, hockey, and football—the only one with an exclusive out of market broadcasting arrangement is the NFL/DirecTV Sunday Ticket.  Major League Baseball ("MLB"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL") all distribute live out of market games through multiple MVPDs, including, for example, DirecTV, Dish Network, Comcast, Cox Cable and Time Warner.

51.     As a result, DirecTV does not charge nearly as much for access to MLB Extra Innings, NBA League Pass, and NHL Center Ice, which provide access to more games per week over a longer season than the NFL.  As the following pricing chart for businesses (with pricing based on viewing licenses) from DirecTV reflects:

| EVO | NFL Sunday Ticket | | | MLB Extra Innings | |
|---|---|---|---|---|---|
| | 1-PAY | 3-PAY | 5-PAY | 1-PAY | 3-PAY |
| 1-50 | 1,458.00 | 486.00 | 291.60 | 595.00 | 198.33 |
| 51-100 | 2,314.00 | 771.33 | 462.80 | 805.00 | 268.33 |
| 101-150 | 4,630.00 | 1,543.33 | 926.00 | 1,120.00 | 373.33 |
| 151-200 | | | | 1,600.00 | 533.33 |
| 201-350 | 6,479.00 | 2,159.67 | 1,295.80 | 2,080.00 | 693.33 |
| 351-500 | 9,258.00 | 3,086.00 | 1,851.60 | 2,400.00 | 800.00 |
| 501-750 | 10,419.00 | 3,473.00 | 2,083.80 | 2,800.00 | 933.33 |
| 751-1000 | 13,888.00 | 4,629.33 | 2,777.60 | | |
| 1001-1500 | 20,832.00 | 6,944.00 | 4,166.40 | 3,600.00 | 1,200.00 |
| 1501-2000 | 27,774.00 | 9,258.00 | 5,554.80 | | |
| 2001-5000 | 57,864.00 | 19,288.00 | 11,572.80 | 4,800.00 | 1,600.00 |
| 5001-10000 | N/A | 34,138.33 | 20,483.00 | 6,000.00 | 2,000.00 |
| 10000+ | N/A | 40,965.00 | 24,579.00 | 8,800.00 | 2,933.33 |

52.     Sunday Ticket prices for both residential and commercial subscribers have increased substantially in recent years.  For example, Professor Roger Noll charted the price increase for the NFL Sunday Ticket for residential consumers relative to price changes in the out-of-market broadcast packages offered by MLB, the NBA, and NHL.  The chart shows how much more expensive Sunday Ticket (which is distributed exclusively through DirecTV) is than offerings in other professional sports (Extra Innings, League Pass, and Center Ice), which are distributed through competing MVPDs.



**Pricing for Regular Season Out-of-Market Television Bundle for Major Professional Sports Leagues, 2005-2010**

Source: DTV-SP0046512.

53.    DirecTV also offers restaurants and bars "amazing exclusive sports content like NFL SUNDAY TICKET."  The National Restaurant Association reports that NFL fans stay longer, often four hours, and order three or more drinks.  The least expensive package is $1,458 per season, and the most expensive runs in excess of $120,000.  The least expensive Sunday Ticket package price increased roughly 11.5% this year and prices for all packages have increased substantially during the Class period.

54.    A case study involving Major League Baseball's ("MLB") negotiation with DirecTV for an exclusive contract to carry baseball's Extra Innings package from 2007 to 2013 can be used to estimate the price premium that DirecTV pays for NFL Sunday Ticket exclusivity, over the price of the right to carry Sunday Ticket that would prevail under non-exclusive terms. Under the proposed exclusive baseball contract, DirecTV agreed to pay MLB $700 million over

seven years (2007–13) for exclusive rights to carry the Extra Innings package.  At that time, a provider called InDemand had made a $70 million per year ($490 million over seven years) bid for non-exclusive rights to carry Extra Innings, but this offer was declined by MLB.  While MLB and DirecTV were finalizing their exclusive contract, public outcry and Congressional pressure forced cancellation of the deal before the season began.  With the prospect of exclusivity eliminated, Extra Innings was carried by both DirecTV and InDemand, thereby offering greater consumer choice in broadcasting than would have been possible under an exclusive contract.  In the MLB case study, DirecTV's $700 million offer can be interpreted as the price of an exclusive Extra Innings contract, and InDemand's $490 million as the price of Extra Innings under a non-exclusive contract.  Therefore, the estimated overcharge arising from an exclusive contract with DirecTV rather than the non-exclusive, multi-carrier contract proposed by InDemand is 43%.

**E.     DirecTV's Participation in the NFL's Scheme**

55.     DirecTV is an active participant in the NFL's conspiracy.  The NFL's contracts with DirecTV explicitly incorporate the challenged restrictions, and DirecTV would not pay what it does were it not assured that it would continue to hold exclusive rights to out-of-market games, which is made possible by the NFL teams' agreement not to compete for television viewers and broadcasting revenue.  The NFL also requires the assent and assistance of DirecTV to implement the challenged restrictions.  Indeed, DirecTV's merger with AT&T was contingent on the challenged restrictions being maintained.  DirecTV has never attempted to sue the NFL to recover overcharges from this anticompetitive conduct, nor is there any likelihood it will given that DirecTV benefits directly from the challenged restrictions in light of the monopoly rates it can charge its Sunday Ticket purchasers.

56.     DirecTV's role in the conspiracy is confirmed by the many valuable favors that DirecTV has done for the NFL in an attempt to maintain the NFL's horizontal agreement, and DirecTV's exclusivity.  For example, as the 2011 NFL season approached, with the NFL's labor deal with the players' union expiring and a possible lockout looming, DirecTV agreed to **gift** the NFL $1 billion even if no games were played that season.  On information and belief, it had no obligation to offer that gift, nor was there any rational reason to do so other than an effort to maintain the cartel.   No other television outlet made such an offer: CBS, ESPN, Fox Broadcasting, and NBC would have paid nothing if no games were played.  DirecTV's promise ensured that owners and league executives would make $1 billion even if the entire season were cancelled, which was an extremely valuable asset for the NFL in face of the potential labor lockout.

57.     The suspect and collaborative relationship between DirecTV and NFL extends far beyond DirecTV's pledge to gift the NFL $1 billion during the recent labor dispute.  Another example is DirecTV's uniquely supportive stance toward the much-maligned NFL Network, a media network dedicated to the sport of American football and owned by the NFL.  Launched in 2003, the NFL Network has been the cause of several disputes between the NFL and other MVPDs.  Up until 2012, NFL Network had a very slow subscriber growth.  That was because many major cable and satellite providers refused to carry the channel, such as Bright House, Cablevision, Comcast, Cox, Dish and Time Warner.  Part of the reason was that DirecTV had the rights to NFL Sunday Ticket and another was the cost of the channel.  Indeed, the Comcast dispute went to trial in April 2009.  DirecTV was one of the few providers that picked up NFL Network right from the beginning.  As NFL Commissioner Roger Goodell stated after renewing

DirecTV's exclusive Sunday Ticket agreement in 2014, "We also appreciate DirecTV's commitment to NFL Network, which it has carried since the channel launched in 2003."

58.     DirecTV recently agreed to sell itself to AT&T in a nearly $50 billion transaction that has attracted federal antitrust scrutiny.  As a condition of the deal, AT&T insisted that DirecTV renew its exclusive deal with the NFL, which DirecTV did in October 2014.

**F.     Exclusivity Is Not Warranted and Less Restrictive Alternatives are Available**

59.     The anticompetitive and exclusive agreements involving the NFL and DirecTV are not warranted.  Defendants could achieve any legitimate, pro-competitive goals without an exclusive arrangement.

60.     The anticompetitive agreements do not improve the broadcast quality of games. Under the current arrangement, the local broadcasters produce all the games that are distributed through the Sunday Ticket, so the quality of the games is not improved by Sunday Ticket but is rather exactly the same feed.  In fact, the lack of competition limits innovation in the quality and services that subscribers might otherwise benefit from in a competitive environment.  For example, competition would likely cause carriers to innovate in notifying viewers of key game events, providing game statistics, or integrating with social media and fantasy football programs.

61.     Nor are the anticompetitive and exclusive arrangements necessary or beneficial. In Canada, for example, the NFL Sunday Ticket is distributed on a non-exclusive basis through the following MVPDs: Shaw Cable; Shaw Direct; TELUS; Optik TV; TELUS Satellite TV; Bell TV; Access Communications; Cogeco Cable; EastLink Cable; Rogers Cable; Vidéotron; Westman Communications; MTS; and SaskTel.  There is no diminishment in quality of the product, or other adverse effect, as a result of the non-exclusive arrangement.  And in the United

States, other professional football products such as the NFL's "Red Zone" package (which offers views of selected in-game highlights) are offered on a non-exclusive basis as well.

62.     Similarly, in contrast to the NFL's exclusive deal with DirecTV, the NBA, the NHL, and MLB offer their live out-of-market game packages through both DirecTV *and* cable sports networks, including, for example, various sports networks owned by Comcast.  In the "but for" world, these other providers would compete for viewers of Sunday afternoon out-of-market NFL football games, which would result in lower prices, as teams and providers competed for viewership.

63.     The exclusive content enjoyed by DirecTV is rare.  Rob Stecklow, general manager of sports products and marketing for DirecTV, admitted as much: "[i]n this time and era where there's less and less content that's exclusive, the NFL still reigns as some of the best content out there."  The only way Plaintiffs and other Class members can view live Sunday afternoon out-of-market NFL football games is by purchasing NFL Sunday Ticket from DirecTV.

64.     The exclusive deal between DirecTV and the NFL for the broadcast rights of NFL Sunday Ticket is only designed to preserve the exercise of market power created by the teams' anticompetitive agreement to monopolize the sales of broadcast rights.  Without the exclusive deal, the supracompetitive prices and the monopoly power created by the collusion among NFL teams would be dissipated by price competition between the individual teams, and between DirecTV and one or more distributors of broadcasts to customers.

65.     Defendants and their co-conspirators' exclusive agreement has a clear negative impact on competition, and serves no pro-competitive purpose.  There is no evidence that this agreement was created to assure the quality of Sunday Ticket or to allow the NFL sufficient

oversight, or any other permissible objective.  Instead, DirecTV and the NFL entered into the agreement with the intent of maintaining a monopoly price for Sunday Ticket.  And, because all the NFL teams have colluded to offer the package, they have also prevented individual competition by teams selling their own games to broadcasters.

66.     There are several less restrictive alternatives which would achieve any legitimate, procompetitive goals.  Those include letting teams contract individually with DirecTV and allowing other distributors to purchase and exhibit the Sunday Ticket package.  The cable consortium proposed such an arrangement in 2002.  DirecTV CFO Pat Doyle ("Doyle") said at a 2013 investors conference that, if the price went up too high when that year's NFL Sunday Ticket deal expired after the 2014 season, DirecTV would consider "striking a non-exclusive deal with the NFL or possibly even dropping the popular package," according to the *Hollywood Reporter*.  And yet, in October of 2014, DirecTV renewed the deal on terms even more lucrative for the NFL and its member teams, so that it could charge monopoly and supracompetitive rates to its purchasers.

67.     Plaintiffs seek to restore competition by ending the collusive agreement by Defendants that eliminate competition in the distribution of the live out-of-market NFL games over television, while monopolizing or attempting to monopolize the broadcast market for out of market Sunday afternoon NFL games.

68.     DirecTV has admitted that the conduct it has engaged in here flouts the consumers' interests.  For example, on August 31, 2012, DirecTV wrote to the Federal Communications Commission in support of a proposed rule extending a ban on vertically integrated cable companies from withholding access to RSNs from other MVPDs, including DirecTV:

Six years ago, the Commission used a regression analysis to evaluate and quantify the potential harm to competition that results when a cable-affiliated programmer withholds content from rival MVPDs.  Among other things, the Commission found that, as a result of the decision by the Cox affiliated regional sports network ("RSN") in San Diego to deny its programming (including games of the San Diego Padres) to MVPD rivals, DBS penetration in the San Diego market was 40.5% lower than it would have been if that programming had not been withheld.  The attached economic analysis of San Diego subscribership is qualitatively consistent with the Commission's finding about the damage done when cable-affiliated programmers withhold content from competitors.

This updated analysis takes advantage of the fact that the Cox RSN recently lost the rights to telecast Padres games.  This season, those games are available to all MVPDs through Fox Sports San Diego ("FSSD").  DIRECTV carries FSSD, as does Cox.  These recent developments in San Diego offer a natural experiment through which to evaluate the effects of gaining access to valuable content.  Accordingly, DIRECTV asked Professor Kevin Murphy to augment his prior economic analysis in this proceeding with an analysis of subscribership in San Diego in light of this new RSN arrangement.

As more fully detailed in Professor Murphy's attached report, the data from 2012 are consistent with the Commission's finding in 2006.  In order to evaluate the effect on DIRECTV's subscribership from gaining access to Padres games, Professor Murphy first calculated the difference in the growth rate in the number of DIRECTV subscribers in San Diego before and after these RSN changes.  He then calculated this difference for a set of control markets, and compared the before-and-after difference in DIRECTV's growth rates in San Diego to the before-and-after difference in DIRECTV's growth rates in the control markets.  The results of this analysis indicate that DIRECTV has gained substantially more subscribers in San Diego since it gained access to Padres games through FSSD than would have been expected based on its subscribership trends in comparable markets.  These gains were achieved in only the first five months of DIRECTV's FSSD carriage; the long run effects likely will be larger, as additional San Diego households revisit their MVPD choice.  These conclusions are further supported by customer surveys, which evidence an increase in the number of new subscribers citing "access to sports channels" as the reason for subscribing to DIRECTV since it began carriage of FSSD.

69.    Thus, as DirecTV's own data demonstrates, consumers benefit from the non-exclusive distribution of live sports content by way of enhanced competition amongst MVPDs.

**G.      Restraint of Trade and Antitrust Injury**

70.     Plaintiffs and the Class were, and continue to be, harmed by Defendants' anti-competitive agreement with NFL.  Plaintiffs and the Class are direct purchasers of NFL Sunday Ticket and the territorial restrictions enforced by the exclusive arrangement between DirecTV and the NFL causes Plaintiffs and the Class to pay a higher, supracompetitive price for the package of live out-of-market NFL games than they otherwise would have paid if the agreements were negotiated competitively.

71.     The challenged restrictions described above have restrained horizontal competition between and among the distributors of NFL games, including competition in the commercial exploitation of televised presentations of live games.  In particular, without the exclusive licenses and other competitive restraints, DirecTV, the television networks, and other MVPDs would compete with each other in the distribution of NFL games to a much greater extent than the limited opportunities now available.

72.     The agreements described above have adversely affected and substantially lessened competition in the relevant markets.  As a result, prices are higher than they would be in the absence of the agreements to restrict competition.

73.     The agreements described above do not concern matters of NFL structure and do not concern any unique characteristic or need of football exhibitions.  These anticompetitive restraints are not necessary to the exhibition of football and are not integral to the sport itself.

74.     There are no legitimate, pro-competitive justifications for these exclusive license agreements and other competitive restraints, which would justify the anticompetitive harms they create.

75.     A similar issue was dealt with in the case of *Laumann v. National Hockey League*, Nos. 12–cv–1817 (SAS), 12–cv–3704 (SAS), 2014 WL 3900566 (S.D.N.Y. Aug. 8, 2014).

There Judge Shira Scheindlin was dealing with agreements by MLB and the NHL with DirecTV that involved the telecasting of games outside of a member team's home territory. Judge Scheindlin denied summary judgment, finding triable issues as to antitrust injury:

> Plaintiffs have carried their initial burden of showing an actual impact on competition. The clubs in each League have entered an express agreement to limit competition between the clubs—and their broadcaster affiliates— based on geographic territories. There is also evidence of a negative impact on the output, price, and perhaps even quality of sports programming. Plaintiffs' expert, Dr. Roger G. Noll ["Noll"], attests that consumers pay higher prices for live game telecasts, and have less choice among the telecasts available to them, than they would in the absence of the territorial restrictions. Similarly, Dr. Noll estimates that the price of OOM [out-of-market] packages would decrease by about fifty percent in a world without the restrictions.

*Id.* at *8. She went on to rule that there were jury issues as to whether telecasters like DirecTV were participants in the conspiracy between MLB, the NHL and their member clubs. *Id.* at *12-13.

76. The expert evidence by Noll provided in that case and cited by Judge Scheindlin was as follows:

> The ability to extract more revenues from an exclusive contract arises because out-of market telecasts are a subscription driver for MVPDs [multichannel video programming distributors like DirecTV]. The benefits of exclusivity to the licensee then can be captured by MLB through higher rights fees by auctioning the exclusive rights to the highest bidder. If live telecasts of other sports, or other types of programming, were close competitive substitutes for MLB Extra Innings, DirecTV would not be able to obtain greater revenue from subscribers by obtaining exclusive rights, and so MLB would not be able to extract additional revenue by selling Extra Innings on an exclusive basis.

"Declaration of Roger G. Noll," p. 89 (Feb. 14, 2014), filed in *Laumann v. National Hockey League*, Nos. 12–cv–1817 (SAS), 12–cv–3704 (SAS) (S.D.N.Y.).

77. Noll made a similar point in testimony before the United States Senate Judiciary Committee at a November 14, 2006 hearing on "Competition In Sports Programming And Distribution: Are Consumers Winning?":

The relevant benchmark for whether an action is pro- or anti-competitive is the circumstance that would prevail in a competitive world.  The argument that NFL Sunday Ticket increased output is correct, but it increased output in a monopolized market.  The issue is what is the alternative in the absence of monopolization, and in the absence of monopolization, the market for televised NFL games would be like other pro sports were or like college sports are today.  For example, if all broadcasting of college football games were put together into a single package priced at $150 a month and shown exclusively through DirecTV, the effort would be a profit-enhancing reduction in output.  From my perspective, if one adopts the right counterfactual, the right but-for world in the competitive environment, it is obvious that NFL Sunday Ticket is a palliative compared to the output and prices that would exist in a competitive environment."

## H.   The Sports Broadcasting Act and the Single-Entity Rule Do Not Immunize Defendants' Anticompetitive Acts

78.   Congress enacted the Sports Broadcasting Act of 1961 ("SBA"), which granted major sports leagues certain exemptions from antitrust liability when entering into pooled-rights contracts.  Critically, the SBA is limited to "sponsored telecasting," which means that the SBA does not apply to satellite television, such as DirecTV. *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 489 (S.D.N.Y. 2012) (Scheindlin, J.) ("'Sponsored telecasting' under the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view, and satellite television networks."  (quoting *Kingray, Inc. v. NBA, Inc.,* 188 F.Supp.2d 1177, 1183 (S.D.Cal. 2002)).

79.   In fact, the Supreme Court recognized that the SBA confirms that many agreements between sports teams—such as the NFL's agreement concerning the Sunday Ticket—would run afoul of the Sherman Act if not protected by the Act:

[The SBA] demonstrates Congress's recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in *United States v. National Football League*, 116 F.Supp. 319 (ED Pa. 1953), which held that an agreement among the teams of the National Football League [not to telecast games in certain geographic areas at certain times] violated § 1 of the Sherman Act.

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 106 (1984).

80.     Nor is the NFL exempt from the antitrust laws under the "single-entity" rule. The broadcasting rights at issue here belong initially to the individual teams.  Absent the challenged restraints, the teams would compete against each other in selling television rights for their games.  In *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010), the United States Supreme Court rejected the NFL's claim that an agreement regarding the joint marketing of club-owned intellectual property was the decision of a "single entity"—the league—not subject to section 1 of the Sherman Act (15 U.S.C. §1).  Judge Scheindlin, for similar reasons, rejected the parallel argument that NHL and MLB teams were immune from antitrust immunity under the single-entity rule.  *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 485-86 (S.D.N.Y. 2012).

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23 on behalf of all persons (including businesses but excluding Defendants; their present and former parents, subsidiaries, affiliates, and co-conspirators; and government entities) who fall within the following Class (the "Class"):

> All persons that purchased the NFL Sunday Ticket within the United States from DirecTV, or its subsidiaries, at any time beginning four years prior to June 17, 2015 and until the effects of the anticompetitive conduct described herein end.

82.     DirecTV has sold its Sunday Ticket service to Class members across the nation during the relevant period.  Defendants have charged supracompetitive prices for that service.

83.     The Class is so numerous that joinder of all members is impracticable.

84.     There are questions of law and fact common to the Class, including:

a.   Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15
     U.S.C. § 1;

b.   Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15
     U.S.C. § 2;

c.   Whether Defendants have engaged in and are continuing to engage in a
     contract, combination, or conspiracy among themselves to fix, raise, maintain
     or stabilize prices of video presentations of live Sunday NFL games by
     eliminating competition among presenters of out-of-market NFL games;

d.   Whether Defendants have engaged in and are continuing to engage in a
     contract, combination, or conspiracy among themselves to fix, raise, maintain
     or stabilize prices of the Sunday Ticket by preventing any competitor from
     offering competing products;

e.   The identities of the participants in the conspiracy;

f.   The duration of the conspiracy and the acts performed by Defendants in
     furtherance of it;

g.   Whether the conduct of Defendants caused injury to the Plaintiffs and the
     other members of the Class; and

h.   The appropriate Class-wide measure of damages.

85.     Plaintiffs and the Class were, during the Class period, purchasers of the Sunday
Ticket package.  Their claims are typical of the claims of the Class, and the named Plaintiffs will
fairly and adequately protect the interests of that Class.

86.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

87.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

88.    The prosecution of separate actions by individual members of the Class would also create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

89.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Section 1 of the Sherman Act
### (Per Se Violation)

90.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants, including the 32 teams that comprise the NFL, entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition in the live game

distribution market with the purpose, intent, and effect of restraining trade and commerce in the distribution of live NFL games, in violation of Section 1 of the Sherman Act (15 U.S.C.§ 1).

91.     This contract, combination or conspiracy has resulted in an agreement understanding, or concerted action between and among the Defendants that the Sunday Ticket will exclusively be provided by DirecTV.  The agreement forbids any other MVPD from offering the same product.

92.     The contract, combination or conspiracy alleged above has substantial horizontal elements, including agreements between the 32 NFL teams, to limit competition between and among the member teams, who would otherwise be competitors in the live game distribution market, such that application of the per se rule is justified under the facts and circumstances set forth herein.

93.     This contract, combination, or conspiracy has also restrained competition between and among the DirecTV and potential competitors in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects, including increased prices and reduced output, and otherwise caused injury to consumers and competition in those relevant markets and elsewhere.

94.     The Defendants' contract, combination, agreement, understanding or concerted action occurred in or affected interstate commerce.  The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants.

95.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above.  Plaintiffs and other commercial subscribers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO

### Violation of Section 1 of the Sherman Act
### (Rule of Reason)

96.     Plaintiffs, on behalf of themselves and the Class, incorporate and re-allege the preceding paragraphs of the complaint.

97.     Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition in the live game distribution market with the purpose, intent, and effect of restraining trade and commerce in the distribution and broadcasting of live NFL games, in violation of Section 1 of the Sherman Act (15 U.S.C.§ 1).

98.     This contract, combination or conspiracy has resulted in an agreement understanding, or concerted action between and among the Defendants that the Sunday Ticket will exclusively be provided by DirecTV.  The agreement forbids any other competitor from offering the same product.

99.     This contract, combination, or conspiracy has also restrained competition between and among the DirecTV and potential competitors in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged herein, and caused injury to consumers and competition in those relevant markets and elsewhere.

100.    The relevant geographic market is the United States.  The relevant product market is the market for live distribution of NFL games through the Sunday Ticket service to commercial subscribers.  The Defendants explicitly recognize this product market and have, in fact, trademarked the Sunday Ticket name.  The Defendants direct advertising and marketing dollars towards this market and to commercial subscribers, specifically.

33

101.    The NFL, and its 32 teams, has monopoly power with respect to the creation, licensing, and distribution of NFL games.  DirecTV has market power in the MVPD market, generally, and specifically in the market for commercial subscribers.  DirecTV's exclusive arrangement with the NFL for the distribution of Sunday Ticket enhances DirecTV's market power in the MVPD market, generally, and provides it with a monopoly in the market for the live distribution of NFL games through the Sunday Ticket service.

102.    The Defendants' contract, combination, agreement, understanding or concerted action occurred in or affected interstate commerce.  The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants.

103.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced output, as set forth above.  Plaintiffs and other commercial subscribers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT THREE

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT

104.    Plaintiffs, on behalf of themselves and the Class, incorporate and re-allege the preceding paragraphs of the complaint.

105.    Defendants, by the above-mentioned conduct, possess monopoly power over the creation, licensing, and distribution of live NFL football broadcasts and have used that power for the purposes of unreasonably excluding and/or limiting competition, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), by limiting the distribution of the Sunday Ticket service to only one MVPD, DirecTV.  These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of Defendants' market position.

106.    The relevant geographic market is the United States.  The relevant product market is the market for live distribution of NFL games through the Sunday Ticket service to commercial subscribers.  The Defendants explicitly recognize this product market and have, in fact, trademarked the Sunday Ticket name.  The Defendants direct advertising and marketing dollars towards this market and to commercial subscribers, specifically.

107.    Through the anti-competitive conduct described herein, DirecTV has willfully acquired and maintained monopoly power, and unless restrained by the Court, will continue to willfully maintain, that monopoly power in the relevant market by anti-competitive and unreasonably exclusionary conduct.  The NFL, by and on behalf of its 32 member teams, have acted with an intent to allow DirecTV to illegally acquire and maintain that monopoly power in the relevant product market, and Defendants' illegal conduct has enabled DirecTV to do so, in violation of Section 2 of the Sherman Act.

108.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, as set forth above.  Plaintiffs and other commercial subscribers will continue to suffer antitrust injury and other damage unless Defendants and their coconspirators are enjoined from continuing to engage in the foregoing violations of law.

## COUNT FOUR

### UNJUST ENRICHMENT

109.    Plaintiffs, on behalf of themselves and the Class, incorporate and re-allege the preceding paragraphs of the complaint.

110.    It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their collusive acts and at the expense of the Plaintiffs and members of the Class.

111.    The Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

112.    Alternatively or additionally each Defendant should pay restitution or its own unjust enrichment to the Plaintiffs and members of the Class.

## COUNT FIVE

### VIOLATION OF NEW YORK'S DONNELLY ACT

113.    The New York plaintiffs, on behalf of themselves and members of the Class who reside in New York ("New York Class"), incorporate and re-allege the preceding paragraphs of the complaint.

114.    The conduct set forth above had a significant impact on intrastate commerce in New York.  The New York plaintiffs purchased Sunday Ticket in New York and consume the product in New York.  NFL Enterprises LLC, which was organized to hold the broadcast rights of the 32 NFL teams and license them to MVPDs and other broadcasters, including DirecTV, is located at 345 Park Avenue, 7th Floor, New York, NY 10154.  The National Football League, Inc. also has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.  Moreover, many of the NFL teams are headquartered in New York and/or incorporated in New York.

115.    The aforementioned practices by Defendants were and are in violation of New York's Donnelly Act, New York General Business Law § 340 *et seq.*

116.    As a result of Defendants' violations of the New York Donnelly Act, New York plaintiffs and the New York Class are entitled to bring this claim to recover herein compensatory damages, punitive and special damages, including but not limited to treble damages, reasonable attorneys' fees and costs and injunctive relief.

## COUNT SIX

### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT

117.    The Plaintiffs, on behalf of themselves and members of the Class, incorporate and re-allege the preceding paragraphs of the complaint.

118.    The aforementioned practices by Defendants were and are in violation of California Business and Professions Code section 16720.

119.    Accordingly, Plaintiffs seek three times their damages caused by Defendants' violations of the Cartwright Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of the Cartwright Act.

## COUNT SEVEN

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

120.    The Plaintiffs, on behalf of themselves and members of the Class, incorporate and re-allege the preceding paragraphs of the complaint.

121.    The aforementioned practices by Defendants were and are in violation of California Business and Professions Code sections 17200 *et seq*. ("Unfair Competition Law").

122.    The Defendants' actions, as alleged above, were unfair, unlawful and/or unconscionable, both in their own right and because they violated the Sherman Act and the Cartwright Act.

123.    The Defendants' conduct injured Plaintiffs and the Class by charging supra-competitive prices for NFL Sunday Ticket and restricting competition in the market for the live broadcast of Sunday afternoon NFL games.  Plaintiffs and the Class are therefore persons who have suffered injury in fact and lost money or property as a result of the unfair competition under California Business and Professions Code section 17204.

124.     Pursuant to California Business and Professions Code section 17203, injunctive relief is appropriate to enjoin Defendants from engaging in their unfair acts and practices, as well as restitution (plead in alternative to money damages for other claims).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

1.     That the Court determines that this action may be maintained as a Class action under Fed. R. Civ. P. 23, and that Plaintiffs be named representatives of the Class.

2.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act and other applicable law.

3.     That Defendants and their co-conspirators' actions to illegally acquire and maintain monopoly power in the relevant product market, be adjudged to have been in violation of Section 2 of the Sherman Act and the Cartwright Act.

4.     That judgment be entered for Plaintiffs and members of the Class against Defendants for damages and special damages, including three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and other applicable law.

5.     That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law.

6.     That Defendants and their co-conspirators be enjoined from further violations of the antitrust and other applicable laws.

7.      That Plaintiffs and members of the Class have such other, further or different

relief, as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on all matters so triable.

Dated:  August 26, 2015

**SUSMAN GODFREY L.L.P.**

By:  */s/ William C. Carmody*
         William C. Carmody (WC-8478)
         Arun Subramanian (AS-2096)
         Seth D. Ard (SA-1817)
         Ian M. Gore (IG-2664)
         560 Lexington Avenue, 15th Floor
         New York, New York 10022
         Telephone:  (212) 336-8330
         Facsimile:  (212) 336-8340

         *Attorneys for Plaintiffs*